449 S.W.2d 890 (1970)
H________ B_________, Appellant,
v.
R________ B_______, Respondent.
No. 33451.
St. Louis Court of Appeals, Missouri.
January 20, 1970.
*891 Cox & Moffitt, Dallas W. Cox and William A. Moffitt, Jr., St. Louis, for appellant.
Anderson, Anderson & Brooking, John L. Anderson, Hillsboro, for respondent.
CLEMENS, Commissioner.
The plaintiff-mother appeals from an order granting the defendant-father's motion for a change in custody of the parties' two children, nine and fourteen years old. In the original divorce suit, heard on default in 1962, the court had granted a divorce and child custody to the mother. Two years later, in 1964, the mother informally turned the children over to the father. He has had actual custody since then and now seeks legal custody.
After hearing testimony from the parties, their present spouses and several of the mother's relatives, the trial court granted custody to the father, with alternate weekend visitation in the mother's home. She appeals. The ultimate issue: Which is the better home for the children, the father's affording somewhat sounder personal qualities, or the mother's offering far better physical and financial conditions?
On this review we bear in mind the solemn responsibility cast upon a trial judge who must decide issues of child custody. At trial his judicial discernment is challenged; he becomes steeped in the atmosphere of the controversy; his ability to assess the character of the witnesses and to weigh their testimony exceeds ours. Because of this, Civil Rule 73.01(d), V.A. M.R., wisely directs that although we make our own findings of fact we must bear in mind the trial court's better position to judge the witnesses' credibility, and we may disturb the trial court's judgment only when it is clearly erroneous.
At the outset, the marital ventures of the parties needs to be clarified. Soon after the divorce in 1962 the mother remarried and had a child. She was divorced in 1967 and in 1968, about five months before the hearing, the mother, then 32 years old, married her present husband, E. P., fifty years old. This was also his third marriage, the first two ending in divorce. The father's marital record is simpler. Soon after the mother divorced him he married a widow, D. B., then 37 years old. She has a teenage son by her deceased husband.
Although the mother married her second husband in 1962 soon after her divorce from the father, she left the children in her parents' home. The grandmother "raised them" until May of 1964 when the grandfather had a heart attack. By then the father had married D. B., and they were living on their farm in Washington County. The mother and grandmother each asked the father and D. B. to take the children into their home. There they have stayed since May of 1964. The father and D. B. kept the grandmother and mother informed of the children's condition and activities, and have often taken them to visit in the grandparents' home. During these four years the mother saw her children infrequently, usually when they were visiting in the grandparents' home. It was only after her marriage to E. P., five months before the hearing, that she showed a desire for the children's custody.
By then the children were settled securely in the father's and stepmother's farm home. They are happy there, but want to keep cordial contact with their mother. The father's home lies in the rugged hill country of Washington County, half a mile off the highway and school bus route. The children roam over the farm with friends, including several horses that have become their pets.
*892 The father's conduct before he married D. B. five years ago was poor. He had a severe drinking problem, now fully corrected. For two years he did not make child-support payments but with some help from D. B. that too has been corrected. When he separated from the mother he was having an affair with a woman in Ohio; a child was born to her out of wedlock. The father does not support that child but has kept contact with its mother and the child has been a welcome visitor with the father and D. B. The father has worked hard and regularly the past three years. He earns "enough to get by" but D. B. works part time to help make payments on the farm and afford a few extras for the family. The father is home from work in time for a family dinner, and is with the children on weekends.
Probably the strongest character of all the adults concerned is D. B., the children's stepmother. Clearly she loves them. She gives them solid discipline, has them on a firm spending-money allowance and has assigned them regular household chores. She is considerate of their emotional ties with their mother and maternal grandparents. The children have been given medical attention when needed and they attend Sunday school regularly. Their school grades are excellent, including attendance, health, hygiene and neatness. D. B.'s handling of an unfortunate occurrence reflects her maternal character. Her son once made improper sexual advances toward one of the children, who was slightly injured in the scuffle. D. B. promptly thrashed her son, immediately informed the child's mother and grandmother and began an informal course in sex education for each child. The son and the child now enjoy a wholesome relationship. Shining through the written transcript is D. B.'s unselfish maternal concern and love for the children.
E. P., the new stepfather, is a "good provider", offering a small modern home in St. Louis. The mother does not work and could give full time to the home and children. The stepfather acknowledged that the children are polite and well disciplined. He said he was willing to adopt them. He testified strongly, though petulantly, for the mother; his interest seemed to be more in her winning the lawsuit than a true paternal concern for the children.
The only independent witness to testify was the wife of the Bs' pastor, who has children about the same age, frequent companions. She said the children were well mannered and lovable.
Our greatest concern about leaving the children with their father lies in the physical condition of his and D. B.'s farm home. As a dwelling it has few virtues. There are two bedrooms, one for the Bs' and a small one for the two children; D. B.'s son sleeps elsewhere, probably in an attic. The father admitted the home is "not sharp"; is "just a place to live." It is barely "modern." An outdoor privy and an inside washtub were used often, not uncommon things for rural homes. A toilet and shower in the basement worked sporadically. The two children occasionally slept in the basement because it gave them more room but at times the septic tank stopped up and the toilet overflowed. When that occurred once or twice the children moved back to their upstairs bedroom. The housekeeping was poor, but all evidence of this came from witnesses related to the mother; four of them had been in the home but once. According to them the house was dirty and disorderly, one telling of seeing bugs, accumulated dirt and the toilet overflow. The maternal grandmother, often in the home, said it was always filthy. Two relatives testified the children had come to the grandparents' home when their bodies and clothing were unclean. None of this is reflected in the children's school records. There, they rated high in health, hygiene and neatness. Nor is the home's claimed unwholesomeness reflected in the children's intellect or behavior.
The mother knew of this claimed uncleanliness for several years without protesting *893 or taking action. While married to her second husband from 1962 to 1967 she was content to leave the children with the grandparents (1962 and 1963) and with the father (1964 to 1968). Only when the father sought this formal change of custody in 1968 did the mother raise the issue about the children living in a disorderly and unsanitary home. The mother's prolonged silence and inaction tend to weaken her evidence of the unwholesomeness of the father's home. And her inaction fails to demonstrate the high degree of maternal concern for the children's welfare that forms the basis for maternal preference in child custody cases.
We have considered the cases cited by each party. Both cite Davis v. Davis, Mo. App., 254 S.W.2d 270, and Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845. There are no differences in the principles announced, merely differences in applying those principles to factual settings, no two of which are alike.
Few problems have absolutely satisfactory solutions. In child custody cases the trial judge rarely enjoys the luxury of deciding between a good home and a poor one. Often he must select the better of two poor ones. His decision is influenced by the character of the parties and their witnessesfactors more apparent to him than to us. The rule of appellate deference to trial court decisions is sound. Here the trial court chose the superior parental character of the father and stepmother over the superior physical and financial factors offered by the mother and stepfather. We cannot say that decision was clearly erroneous. We affirm the granting of the father's motion to modify.
In her reply brief the mother raises an issue over the trial court's reliance on a purported investigative report of a social welfare worker. The mother insists we should give this no consideration. We agree. In ruling on a motion pendente lite and setting the case for hearing on a day certain the trial court announced it would direct the welfare department to make studies and reports of each parent's home. But the record makes no further reference to any report. In that state of the record we cannot convict the trial court of improperly considering the result of home studies. But we do not wish this ruling to be considered as approving the unlimited use of such social studies and reports.
There would seem to be no reason to exclude the oral testimony of an investigating social worker, made under oath, subject to cross-examination, and open to objections for hearsay and unwarranted opinion. But a court's consideration of a social worker's sub-rosa report violates the principle of due process. Compare State ex rel. Hurwitz et al. v. North, 304 Mo. 607, 264 S.W. 678 [7]; and In re Jackson's Will, Mo.App., 291 S.W.2d 214 [22]; and see 16A C.J.S. Constitutional Law §§ 622, 624, and 16 Am.Jur.2d, Constitutional Law, § 569. As said in Hyman v. Muller, 1 N. J. 124, 62 A.2d 221: "There is no hearing when the affected party has not the means of knowing what evidence is offered or considered and is not afforded an opportunity to test, explain or refute it." See also Philadelphia Co. v. Securities and Exchange Commission, 84 U.S.App.D.C. 73, 175 F.2d 808, vacated 337 U.S. 901, 69 S.Ct. 1047, 93 L.Ed. 1715.
In Benjamin v. Benjamin, Mo.App., 370 S.W.2d 639 [14, 15], we said of a social worker's report: "It is pure hearsay, and not only is there no statutory authority for its preparation, we think its reception could not be countenanced as an exercise of the court's inherent equitable powers. * * * Nevertheless, if the record disclosed that this case had been decided on the strength of that report we would seriously consider whether we ought not reverse it in the exercise of our discretionary powers under Rule 79.04, V.A.M.R."
If such a study is made and a report thereof made to the court it could reasonably be inferred that the report brings to *894 the chancellor's mind information intended to affect his decision; that creates the intolerable possibility of a decree being based on matters dehors the record, unknown to counsel and unknown to an appellate court. This danger induced us to warn in Benjamin that consideration of a written report as distinguished from the open-court testimony of the investigatorcould well lead to a reversal for plain error. (Civil Rule 79.04, V.A.M.R.).
We decline to take that action here only because the record shows nothing of a report being made. Had it done so our ruling might well be different, and probably would have been compelled if the point had been preserved for review.
PER CURIAM:
The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. The order granting defendant's motion to modify the decree of divorce is affirmed.
WOLFE, P. J., and BRADY and DOWD, JJ., concur.