BUTCHER, APPELLEE, *v.* POLLARD ET AL., APPELLANTS.

(No. 31185—Decided September 28, 1972.)

*Mr. John G. Pegg* and *Mr. Frank C. Lyons,* for appellee.

*Mr. William G. Meckler, Messrs. Arter & Hadden* and *Mr. Edward C. Baran,* for appellants.

JACKSON, J. The case at bar invites consideration of the plight of a child who was denied benefits under her father's group life insurance policy solely because she suffered the misfortune of being born illegitimate. She appeals the trial court's grant of summary judgment which directed that the entire proceeds be paid to her half sister who was born legitimate.

The facts leading up to this litigation are not complex. Denois Butcher, the insured, held a group life insurance policy issued by The Travelers Insurance Company through

his employer, the Penn Central Railroad. The policy provided for $6,000 in death benefits and for an additional $4,000 if the insured suffered death by "accidental means." It also contained the following provision, hereinafter referred to as the substitute beneficiary clause, the interpretation of which is the legal storm center of this appeal:

"Payment of any part of the life insurance for which there is no beneficiary designated by the employee or surviving at the death of the employee shall be made to the employee's wife or husband if living at the death of the employee; if not living, to the employee's surviving *children*; if none survives, to the executors or administrators of the employee." Article X, Section 2. (Emphasis added.)

On October 24, 1968, while covered by this policy, the insured met his untimely demise as a result of gunshot wounds inflicted during an altercation with another individual. Because the insured had not specfically named any beneficiaries, Article X, Section 2 of the policy, quoted above, became determinative of who was entitled to the proceeds. Perhaps compliance with this provision would not have created any problems if it were not for the unsettled state of the insured's domestic affairs.

Seven years prior to his death, the insured fathered two children, one legitimate and the other illegitimate. The first child, Yvette, was born on May 30, 1961, as a result of the insured's marriage to Carrie Butcher, the plaintiff-appellee,[1] who brought this action on behalf of her daughter. In July 1961, Rita Bell Pollard, the defendant-appellant, filed a paternity action against the insured, and the following October she gave birth to the second child, Monique. Three weeks after the birth of this illegitimate child, the insured was adjudged her reputed father in the Juvenile Court of Cuyahoga County.[2]

In an effort to secure all the insurance benefits for

[1]After the birth of Yvette, but prior to the insured's death, the plaintiff divorced him.

[2]This was stipulated by the parties. However, there is nothing in the record before us to indicate what sort of support order, if any, was imposed by the Juvenile Court or whether the insured was diligent in his payments.

Yvette, the legitimate daughter, her mother, Carrie Butcher, as a guardian ad litem, filed a petition for money only and an action for declaratory relief. Named as defendants were the illegitimate daughter Monique Pollard, her mother and guardian Rita Bell Pollard, The Travelers Insurance Company and The Travelers Indemnity Company. The monetary action prayed for a judgment of $10,000, reflecting $6,000 in basic, death benefits and $4,000 in accidental death benefits. The declaratory action prayed for a judgment declaring that Yvette was the only legitimate daughter of the insured and was thus the only person entitled to the insurance proceeds. The defendant Rita Bell Pollard counterclaimed for $5,000, which represented her illegitimate daughter's purported half interest in the maximum payable benefits. In their consolidated answer, Travelers Insurance and Travelers Indemnity admitted that $6,000 was owing, but denied that the insured had died by accidental means or that the $4,000 accidental death benefits were payable. Simultaneously, the insurer deposited $6,000 with the Clerk of Courts, subject to the court's determination of the beneficiaries.

Motions for summary judgment were filed by all the parties. Based upon the pleadings and affidavits, the trial court found that Yvette Butcher was the insured's only legitimate daughter and held that she was the sole beneficiary to the insurance. Accordingly, the plaintiff's motion for summary judgment was granted to the extent of the $6,000 held by the Clerk of Courts.[3] The defendant Rita Bell Pollard, on behalf of her daughter Monique, appeals this adverse judgment. We reverse.

This case requires that we determine the meaning of

[3] Plaintiff's motion insofar as it prayed for the accidental death benefits of $4,000 was overruled, as was Travelers' opposing motion for summary judgment on the same issue. Travelers has appealed this unfavorable ruling. (App. No. 31186.) In a separate entry, we have dismissed Travelers' appeal, for the simple reason that the overruling of a motion for summary judgment is not a final appealable order. *State, ex rel. Overmeyer,* v. *Walinski* (1966), 8 Ohio St. 2d 23; see R. C. 2505.02. There is indeed a material issue in dispute as to whether the insured met his death by accidental means. We intimate no view on that question but properly leave it for the trier of fact to consider.

4

the word "children" as it appears in the substitute beneficiary clause of a group life insurance policy. We are well aware that we are not writing upon a clean slate. At least three courts have previously considered this precise issue, with only one having ruled in favor of the illegitimate child. The other two courts rejected the illegitimates' claims, but these cases hardly provide the needed ballast to sustain any assertion that the weight of authority requires us to follow in its stead. Reason and justice outweigh any considereation that may appropriately be given to the precedential boxscore. Before examining these decisions, it is useful to make some preliminary observations about the nature and operation of beneficiary clauses.

The designation of a group life insurance beneficiary is solely a decision of the insured[4] and normally he will name a specific individual or a class of individuals. Whenever a dispute develops over the connotation of the named beneficiary, the court's responsibility is to ascertain and give effect to his intentions.[5] And, although intention is an intangible commodity, it may nevertheless be gathered indirectly through the insured's chosen words and any relevant circumstances prior to and contemporaneous with his decision.[6] But the instant case does not lend itself to this mode of inquiry, for the insured did not specifically designate any beneficiaries. Thus, a factual inquiry into the circumstances surrounding this insurance contract would be inconclusive. What we do face is a generic term, whose legal usage has traditionally contemplated only legi-

[4]*Aetna Life Ins. Co.* v. *Messier* (M. D. Pa. 1959), 173 F. Supp. 90, 97; cf. *Western & S. Life Ins. Co.* v. *Forrey* (Ct. App. Cuyahoga County 1930), 8 Ohio Law Abs. 705, 707.

[5]*John Hancock Mut. Life Ins. Co.* v. *Willis* (6th Cir. 1971), 438 F. 2d 1207, 1208; *New York Life Ins. Co.* v. *Rak* (1962), 24 Ill. 2d 128, 180 N. E. 2d 470; *Smith* v. *Castleman* (1969), 81 N. M. 1, 462 P. 2d 135.

[6]*Krimlofski* v. *United States* (N. D. Ia. 1961), 190 F. Supp. 734, 742; see *Brooks* v. *Brooks* (1949), 32 Tenn. App. 385, 289, 222 S. W. 2d 686, 688. In this regard, it should be noted that group life insurance contracts are usually between the insurer and the insured's employer under a blanket policy; the insured takes no part in its negotiation. See *Aetna Life Ins. Co.* v. *Messier* (M. D. Pa. 1959), 173 F. Supp. 90, 96.

timate children, incorporated into a substitute beneficiary clause which bears no mark of the insured's actual intent.

In analyzing these two elements of this insurance contract more closely we note that the technical legal usage of the term "children" has a history which may be traced back to the primordial beginnings of the common law. This history is significant, for it places in perspective the marked tendency of English and American courts to construe both instruments conveying property and various legislative enactments to the detriment of illegitimates. The core concept which inspired many of the laws affecting an illegitimate's life was that he was *filius nullius*—a child of no one. This idea owes its existence largely to the efforts of the early Christian Church to enforce its religious precepts on sexual morality and to the policy, embraced by both religious and secular authorities, of protecting the monogamous marriage and the family as social institutions against the corrosive effects of extramarital relations.[7] But, as one commentator has astutely observed, an equally potent influence was the self-centered impulses of the fee holders to insulate their lands and their families from the economic burdens and social stigma of bastard children.[8] It has also been suggested that the survival of the feudal system of early England depended in part upon the legal discrimination between legitimate and illegitimate offspring.[9] The lawmakers of that time may well have thought that the stable transfer of tenures and the predictable, uninterrupted rendering of feudal services would be endangered if any long lost products of past indiscretions were allowed to make good their familial claims to land. In keeping with these policies and prejudices there evolved the two notorious rules that a bastard, being an heir of no one, could not

[7] See *Barlow* v. *Orde* (1870), L. R. 3 P. C. 164, 189; Krause, Equal Protection for the Illegitimate, 65 Mich. L. Rev. 477, 498-99 (1967); cf. 1, 2 W. Blackstone, Commentaries 455, 248; Robbins & Deak, Familial Property Rights of Illegitimate Children: A Comparative Study, 30 Colum. L. Rev. 308, 315 (1930).

[8] Krause, *supra* note 7, at 499.

[9] See *S. L. W.* v. *Alaska Workmen's Compensation Bd.* (Alas. 1971), 490 P. 2d 42, 45.

inherit from his parents by intestate succession[10] and that a father was not under any obligation to maintain and support his children, unless required by statute.[11] These rules, of course, have been ameliorated to a large extent by legislation.

Stemming from the first rule was a third one which has a more direct bearing on the issue before us. To aid the courts in the interpretation and construction of wills, it has been stated as follows: Where a testator uses the term ''children'' he is presumed to use it in its legal sense, meaning legitimate children, unless the contents of the will indicate a contrary intention.[12] Courts have justified this rule on the somewhat speculative assumption that a testator would more than likely have intended to devise and bequeath his property to only his legal heirs. But this rule has been employed to discern the probable intentions of not only individuals, but also legislatures. When called upon to define the scope of the word ''children,'' as used in a statute, courts have been strongly inclined to apply the

---

[10]1 W. Blackstone, Commentaries 459. The American judiciary generally acknowledged that this rule was part of its legal heritage, but a more humane and enlightened attitude in this country prompted most of the legislatures to assuage the harshness of this rule. One of the earliest reforms was that an illegitimate could inherit from his mother. See *e. g., Kent* v. *Barker* (1854), 68 Mass. (2 Gray) 535, 536; *Gibson* v. *McNeely* (1860), 11 Ohio St. 131, 136; *Garland* v. *Harrison* (1837), 35 Va. (8 Leigh) 368, 376; *Will of Scholl* (1898), 100 Wis. 650, 660, 76 N. W. 616, 619. Ohio has codified this rule in R. C. 2105.17. Today, many jurisdictions will allow an illegitimate to inherit from his father provided the statutory prerequisites of legitimation or acknowledgment are met. See, *e. g.*, R. C. 2105.18. For an inventory of statutes from other jurisdictions, see Krause, Bringing the Bastard into the Great Society—A Proposed Uniform Act on Legitimacy, 44 Tex. L. Rev. 829, 854-55 (1966).

[11]*E. g., State, ex rel. Beebe*, v. *Cowley* (1927), 116 Ohio St. 377, 379. The upshot of this rule was that an illegitimate could not maintain a civil action against the putative father for support. *E. g., Furillio* v. *Crowther* (K. B. 1826), 7 Dow. & Ry. 612; *Moncrief* v. *Ely* (N. Y. 1838), 19 Wend. 405; *Baston* v. *Sears* (1968), 15 Ohio St. 2d 166, *overruled, Franklin* v. *Julian* (1972), 30 Ohio St. 2d 228; *Gomez* v. *Perez* (Tex. Civ. App. 1971), 466 S. W. 2d 41, prob. juris noted sub nom. *Gomez* v. *Perez*, 33 L. Ed. 2d 331 (1972) (No. 71-575). But see Calif. Civil Code 196a (Deering 1971); *Doughty* v. *Engler* (1923), 112 Kan. 583, 211 P. 619.

[12]See Annot., 34 A. L. R. 2d 4, 19-23 (1954), and cases cited therein

above presumption as a rule of construction.[13] Unsurprisingly, it has determined the construction of many of the descent and distribution statutes[14] and several of the early support laws which did not specifically refer to illegitimates.[15]

In examining the substitute beneficiary clause, we find that it is a rather ubiquitous creature. It serves as a succeeding directive where the insured has simply failed to exercise his contractual right to name a beneficiary, or where the named beneficiary predeceases the insured; it has even been invoked where the named beneficiary survives the insured, but is statutorily barred from receiving the proceeds.[16] In these instances, if it were not for the back-up provisions, the proceeds would more than likely be paid to the insured's estate.[17] Functionally the payment of insurance benefits under the substitute beneficiary clause is quite similar to inheritance under R. C. 2105.06, Ohio's descent and distribution statute. Both the decedent's property and his insurance are distributed upon his death. Both the contract provision and the succession laws become operative in the absence of the decedent's expressed intentions as to how the proceeds and his property are to be allocated.[18] And, both provide that distribution is to be made first to the spouse and children, if possible.

The appellee, of course, urges that we adhere to the

[13]See, e. g., notes 20-23, infra; Kent v. Barker (1854), 68 Mass. (2 Gray) 535; In re Makein (1954), [1955] Ch. 194, 201 [1955], 1 All E. R. 57, 59.

[14]E. g., Blackwell v. Bowman (1948), 150 Ohio St. 34, 37.

[15]See generally Annot., 30 A. L. R. 1075 (1924), and cases cited therein.

[16]John Hancock Mut. Life Ins. Co. v. Willis (6.h ᵗ. 1971), 438 F. 2d 1207 (wife not entitled to benefits because she had fᵗ ᵗniously caused insured's death, under Michigan law).

[17]See Life & Cas. Ins. Co. v. Marks (1945), 72. Ga. App. 640, 34 S. E. 2d 633; Kruger v. John Hancock Mut. Life Ins. Co. (1937), 298 Mass. 124, 10 N. E. 2d 97; Wilson v. Perdue (1969), 16 Mich. App. 80, 167 N. W. 2d 851.

[18]The succession laws have been characterized as representing the intent of a decedent regarding the distribution of his property. Hunt v. Hunt (1853), 37 Me. 333, 347 (dissenting opinion); Garland v. Harrison (1837), 35 Va. (8 Leigh) 368, 371.

ancient, legal definition of "children" and analogize the beneficiary clause to the succession laws, which do not allow an illegitimate child to inherit from the father. Yet, whatever characteristics the substitute beneficiary clause may share with the inheritance laws, it is still part and parcel of a contractual agreement involving expectations which do not necessarily coincide with the purposes of these laws. Moreover, as delineated below, we believe that the reasons supporting the discriminatory, common law definition of children have little relevance in this case.

In turning to the pertinent case law, we find that the first case to hold disfavorably to the illegitimate was *Aetna Life Ins. Co.* v. *McMillen* (N. D. Ohio 1958), 171 F. Supp. 111, 89 Ohio Law Abs. 208. The insured had owned two life insurance policies, each containing a substitute beneficiary provision similar to the one in the instant case. He, of course, had died without naming a beneficiary. At trial, it was admitted that the insured was the putative father of the illegitimate child. Thus, the sole issue was whether the beneficiary term "children" contemplated illegitimates.

For this interpretative venture, the court chose as its compass and sextant a handful of Ohio decisions[19] touching upon parent-child relations in the diverse areas of inheritance,[20] the year's allowance to widow and children,[21]

---

[19]The *McMillen* court, a federal district court, had jurisdiction over this case by virtue of the interpleader statute, which is predicated on diversity of citizenship. 28 U. S. C. §1335 (1970). Because the merits of the case were controlled by state, not federal, law, the court was required to look to Ohio authority. See *Davis* v. *Aetna Life Ins. Co.* (9th Cir. 1960), 279 F. 2d 304, 307. But *McMillen* is not binding on us. *Kelly* v. *Ford Motor Co.* (Cuyahoga County 1957), 104 Ohio App. 185, 193-94; see *Ray Schools-Chicago-Inc.* v. *Cummins* (1957), 12 Ill. 2d 376, 381, 146 N. E. 2d 42, 45; *Bauer Internat'l Corp.* v. *Cagle's, Inc.* (1969), 225 Ga. 684, 686, 171 S. E. 2d 314, 316-17.

[20]*Gibson* v. *McNeely* (1860), 11 Ohio St. 131, which held that an illegitimate daughter could not take as the "issue" under her mother's will. The holding was grounded upon the common-law rule that gifts to children, sons, daughters, or issue were rebuttably presumed to mean only legitimate offspring. *Id.* at 136.

[21]*In re Estate of Humbert* (P. C. Montgomery County 1938), 27 Ohio Law Abs. 252, 3 Ohio Supp. 330, holding that the term "children"

support and maintenance,[22] workmen's compensation[23] and wrongful death actions.[24] Except for the inheritance case, the cited decisions were essentially judicial glossings of state statutes containing the term "children" or its counterpart, "minor"; their common conclusion was that the legislature had intended to adhere to the common law's restrictive definition, which connotated only legitimate offspring. From this token survey, the *McMillen* court proceeded to premise its own legal conclusions on the unexplained proposition that an illegitimate's rights under what is essentially a private contractual agreement must be predicated on "statutory enactment." *Id.* at 115, 89 Ohio Law Abs. at 213. Presumably then it would take a special act of the legislature before an illegitimate could be considered among the class of "children" as used in the undesignated beneficiary clause. In any event, the court reasoned, somewhat solecistically, that since this state's statutes did no more than follow the ancient, jural

in G. C. 10509-74 (recodified as R. C. 2117.20), which provides for a year's allowance from the deceased husband's probate estate to the widow and children, included only legitimates.

[22]*Creisar* v. *State* (1917), 97 Ohio St. 16. This case construed the penal statute which prohibited the failure to support, maintain, or educate a "minor." 103 Ohio Laws 873 (1913) (codified as G. C. 1655). The court limited the statute's reach to only the neglect of legitimate children.

[23]*Miller* v. *Indus. Comm'n* (1956), 165 Ohio St. 584, interpreting "child" in R. C. 4123.59 to mean legitimate children. This statute schedules the payment of benefits to dependents for the death of an employee covered under workmen's compensation.

Whatever validity *Miller* may have had at the time of *McMillen* has, of course, been snuffed out by the recent United States Supreme Court ruling in *Weber* v. *Aetna Cas. & Sur. Co.* (1972), 406 U. S. 164, which held that Louisiana's discriminatory workmen's compensation laws violated the equal protection clause of the Fourteenth Amendment. U. S. Const. Amend. XIV, §1.

[24]*Bonewit* v. *Weber* (Summit County 1952), 95 Ohio App. 428, which narrowly read the term "children" in the wrongful death statute, G. C. 10509-167 (recodified as R. C. 2125.02), as to preclude an illegitimate's action for the death of his father.

In view of *Levy* v. *Louisiana* (1968), 391 U. S. 68, which invalidated Louisiana's discriminatory wrongful death statute, it is doubtful that this decision has any continuing vitality.

10

meaning of "children," the same interpretation must be given the term where it is included in a life insurance policy.

More recently, the Georgia Supreme Court reached a similar conclusion in *Cooper* v. *Melvin* (1967), 223 Ga. 239, 154 S. E. 2d 373, in which the facts are virtually identical to those in the instant case.[25] Like *McMillen,* but on even more sparse review of its state statutes, it found that "children" had generally been defined to mean only legitimate offspring. With this observation, the court evoked Georgia's strong policy of severely restricting a bastard's rights of inheritance to hold that the insurance contract must be construed against the claimants who were born illegitimate.

The third case is the only one of the trilogy to rule in favor of the illegitimate. In *Turner* v. *Metropolitan Life Ins. Co.* (1943), 56 Cal. App. 2d 862, 133 P. 2d 859, which notably preceded both *McMillen* and *Cooper,* a California court held that an illegitimate child fell within the meaning of "children" in the undesignated beneficiary clause of a life insurance policy. The court's opinion developed three grounds for its holding. First, it adhered to the rule firmly established in California, that beneficiary rights to insurance proceeds were governed by principles of contract law, as opposed to the laws of descent and distribution which perpetuated the common law discrimination against illegitimates.[26] Secondly, from a body of rules

[25]The insured had fathered both legitimate and illegitimate offspring, and he had died holding a group life insurance policy, complete with an undesignated beneficiary clause. An interpleader action was filed to determine whether the illegitimate children should be counted as beneficiaries. Upon proof of paternity, the trial upheld the illegitimate's claim and ordered the proceeds divided among all the children. On appeal, the Supreme Court reversed.

[26]56 Cal. App. 2d at 865, 133 P. 2d at 860. By shunning the succession laws the court also avoided a logical dilemma. As *Turner* noted, if this present-day scheme of distribution (see note 10, *supra*) were applied to insurance benefits, it is conceivable that an illegitimate would take where the mother is the insured, but contrawise if the father is the insured. *Id.* at 868, 133 P. 2d at 862. That distribution of insurance proceeds should depend upon the sex of the insured is, in our opinion, not only illogical but plainly absurd.

for interpreting contracts, the court relied upon the statute which declared that: "words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense or unless a special meaning is given to them by usage, in which case the latter must be followed."[27] In favoring "the popular" dictionary meaning of "children," which makes no distinction between legitimates and illegitimates, the court did acknowledge the technical, common law definition, but simply rejected its application outside the sphere of the inheritance laws. Finally, *Turner* asserted the following syllogism: The purpose of life insurance is to provide for the continued maintenance of dependents whom the insured is legally obligated to support during his lifetime; a parent's statutory obligations to support and maintain dependents extends to his illegitimate as well as his legitimate children; therefore, in order to effectuate insurance's avowed purpose of fulfilling the statutory obligations of support and maintence, the word "children" as used in the policy includes all children, regardless of their illegitimacy.

We do not necessarily agree with *Turner* that "children" has a "plain meaning," especially in light of its historical usage in the context of legal documents, nor do we believe that individuals buy insurance with an eye toward fulfilling the obligations of the support laws, particularly since such obligations cease at a parent's death.[28] We nevertheless concur with its basic conclusion that the technical, legal construction of "children" has no place in insurance law. First, while it is true that the insurance business is heavily regulated by the state and it is subject to the policy decisions of the legislature, we have been unable to discover amid the extensive legislation any de-

---

[27]Cal. Civ. Code §1644 (Deering 1971), cited at 56 Cal. App. 2d at 865, 133 P. 2d at 861. This provision is virtually a carbon copy of two rules of interpretation adopted by the Restatement. Compare *id.* with Restatement of Contracts §235(a), (b) (1932).

[28]See *Jacobs* v. *Gerecht* (1970), 6 Cal. App. 3d 808, 86 Cal. Rptr. 217; *Blades* v. *Szatai* (1927), 151 Md. 644, 135 A. 841; *Rice* v. *Andrews* (1926), 127 Misc. 826, 217 N. Y. S. 528; *Wilson* v. *Behr* (Hamilton County 1936), 57 Ohio App. 117, 121.

clared antagonism toward illegitimates as a class. Further, as we have seen, "children" developed a technical meaning for essentially three reasons: The need to guarantee the security of feudal tenures, an artificial presumption of intent, and the policy of discouraging illicit relations. None of the grounds have any particular force in the context of the instant case.

From a purely historical standpoint, we can appreciate the concerns of the feudal landlords for the stable succession of land—their most valuable asset—within an ordered family structure, defined by recognized blood lines. Thus, there may have been a reasonable, pragmatic basis for discriminating against illegitimates. In fact, as recently as this year, the United States Supreme Court recognized that this rationale was still a viable justification for Louisiana's discriminatory inheritance laws.[29] But these justifications are wholly inapplicable to the distribution of insurance proceeds. Insurance is usually not purchased with an eye toward preserving it for devolution to each succeeding generation. Of primary concern is the welfare of the insured's dependents and the ready availability of liquid resources which are not tied up in the insured's probate estate.

We can also understand how ancient courts, in an exercise of judicial empathy, struck upon a rule of construction which was partial to legitimates. For the common law's callous disregard of bastard children undoubtedly loomed large in the minds of all medieval men and most may have actually intended to shun their "accidental offspring" when it came to conveying property. But the problem with the rule then, and probably more so today, was that it carried the grave potential for frustrating the intentions of those who did develop a strong parental bond with their illegitimate children, and on some occasions that potential was, in fact, realized.[30] It would seem that the risk

---

[29] *Weber* v. *Aetna Cas. & Sur. Co.* (1972), 406 U. S. 164, 170, explaining *Labine* v. *Vincent* (1971), 401 U. S. 532.

[30] See *Cartwright* v. *Vawdry* (Ch. 1800), 5 Ves. Jr. 530.

of this would be particularly high with respect to insurance. The dominant motivation behind any purchase of life insurance by a parent is most likely his love and concern for the welfare of his dependents. Indeed, if any presumption is to be made it is the one that makes no distinction between legitimates and illegitimates.

Finally, we find it nothing short of frivolous that the word "children," as it appears in an insurance policy, must be given its archaic and technical meaning as a means of discouraging illicit relations. This is not to deny that the state may have a legitimate interest in deterring extramarital relations. But, in our judgment, the application of a judicial rule of construction to insurance contracts has little impact on a person's choice of a sexual partner.

The mores of contemporary society bear little resemblance to those of yesteryear, as reflected in the liberalized responses of the courts and legislatures. Much has been done to roll back the impact of the common law's indifference to bastard children. And, of course, the most prominent examples have emerged in constitutional adjudication, whose wellspring is the fundamental values and mores of American society. In 1968, the United States Supreme Court overturned, on equal protection grounds, Louisiana's refusal to allow illegitimates the right to bring wrongful death actions.[31] And, during the 1971 Term, the court again vindicated the rights of illegitimates by striking down Louisiana's discriminatory treatment of illegitimates under its workmen's compensation statutues.[32] More recently, new ground has been broken closer to home. In *Franklin v. Julian,*[33] the Ohio Supreme Court fashioned a new remedy for the illegitimate in holding that an action for necessaries and future support may be maintained in his behalf against the putative father, thereby filling a void left by the statutory remedies. One of the underpin-

[31]*Levy* v. *Louisiana* (1968), 391 U. S. 68.
[32]*Weber* v. *Aetna Cas. & Sur. Co.* (1972), 406 U. S. 164.
[33]30 Ohio St. 2d 228.

nings of this decision apparently was the equal protection clause.[34] The significance of these decisions goes well beyond their narrow holdings. They articulate what should have been undisputed—that even illegitimate children are entitled to protection against those laws whose discriminatory purpose, or effect, is irrational and without significant relationship to a valid state interest. Even as we are faced with a narrow rule of construction, which in part reflects our society's values in protecting marriages, we must be mindful of the equally fundamental values which our nation has enshrined in the equal protection clause. As Mr. Justice Powell eloquently stated:

"The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent.

"* * * [B]ut the Equal Protection Clause does enable us to strike down discriminatory laws relating to status of birth where—as in this case—the classification is justified by no legitimate state interest, compelling or otherwise."[35]

We believe that the rule requiring us to construe "children" to mean only legitimate children is irrational and unjust in this instance. Accordingly, we hold that the word "children" in the substitute beneficiary clause of the

---

[34]Id. at 235. This result is not surprising, however. In *Baston* v. *Sears* (1968), 15 Ohio St. 2d 166, 168, the court held that the equal protection clause was not violated by the state's refusal to grant an illegitimate a civil remedy for support. Three justices dissented: O'Neill, Schneider, Herbert, JJ. In *Julian*, these justices, joined by four justices appointed since *Baston*, voted to overrule the earlier decision. Id. at 234 n. 5.

[35]*Weber* v. *Aetna Cas. & Sur. Co.* (1972), 406 U. S. 164.

group life insurance policy of the putative father must be construed to mean all offspring, regardless of legitimacy, and it was error for the trial court to grant the motion for summary judgment on behalf of the legitimate child.

The judgment of the Common Pleas Court is reversed and the cause is remanded, with instructions to enter final judgment consistent with this opinion.

*Judgment reversed.*

Krenzler and Silbert, JJ., concur.

Krenzler, J., concurring. I concur in the judgment of reversal, with the following additional comment.

Discrimination against illegitimate children is well established, both legally and socially, and is based upon the theory that legitimate family relationships must be encouraged and protected. When two people engage in illegal, illicit and illegitimate acts which spawn illegitimate children, the taint of such acts is transferred to the children who are called "illegitimate," rather than on the parents who are, in fact, "illegitimate." The stigma and guilt for such illegitimate acts is not retained by the parents but is borne by the children who were not participants in the illegal act.

It is well recognized that illegitimacy must be discouraged. However, laws having an adverse effect on illegitimate children apparently do not concern the parents and have not served as a deterrent to illegitimate relationships. Penalizing the offspring has not reduced illegitimacy.

Courts and legislative bodies are now taking an objective look at the plight of illegitimate children and are reducing discriminatory practices by removing the distinction between legitimate and illegitimate children. Hopefully, the treatment of illegitimate children the same as legitimate children in the areas of inheritance, torts, contracts and other individual rights will discourage illegitimacy.

In the present case, we are concerned with a contract of insurance and the interpretation of the word "child-

ren" standing alone. In the absence of words of limitation or explanation this should include at least legitimate children, acknowledged illegitimate children and illegitimate children whose paternity has been determined in a court of competent jurisdiction.