**DAVID, Plaintiff-Respondent,**

v.

**CINDY, Defendant-Appellant.**

No. 10816.

Missouri Court of Appeals, Springfield District.

April 27, 1978.

Charles E. McElyea, Phillips, McElyea, Walker & Carpenter Corp., Camdenton, for plaintiff-respondent.

Gene A. Hilton, Camdenton, for defendant-appellant.

TITUS, Judge.

This is a case of anomalies, not the least of which is that it was activated by a male

to have himself declared the natural father and principal custodian of a bastard born March 28, 1974. The trial court obliged and the child's mother appealed.

### Dramatis Personae

*David*—The plaintiff who was 25 years old when the cause was court-tried May 3, 1977.

*Madeline*—David's 48-year-old wife whom he married July 1, 1975. David is Madeline's fifth husband.

*Dorothy*—David's 50-year-old five-times-married mother.

*Cindy*—Defendant-appellant, the 24-year-old mother of the bastard and the mother of two other children ages 9 and 7 years.

*Elizabeth*—A mutual acquaintance of Dorothy, David and Cindy.

*Thomas*—Cindy's husband whose whereabouts has been unknown for years.

*Lynn*—The man Cindy claims is the father of the bastard.

### David's Timetable

On the penultimate weekend of May 1973, David (then 21 years old) first met Cindy (then 20 years old) in a Nebraska-Iowa community. The time of this first meeting was corroborated by testimony of Elizabeth, the avowed introducer of the couple, and Dorothy, David's mother. The following weekend David and Cindy had sexual intercourse. On the third weekend, i. e. the first weekend of June 1973, David and Cindy, accompanied by Cindy's two children, came to Missouri and lived together until September 1973, during which time they copulated on "a regular basis."

### Cindy's Timetable

When Cindy married Thomas she was 15 years old. David said Cindy told him that she and Thomas separated one week after the marriage ceremony; Cindy testified the

separation, without divorce, occurred in December 1967. In May 1973, Cindy commenced "dating" 27-year-old Lynn and they had sexual relations "four or five times a week" until she transferred the habit to David. Cindy recounted that her last menstrual period before the baby was born commenced June 10, 1973, and that she did not meet David until the middle of June 1973 and did not have sexual intercourse with him until near July 17, 1973. Thereafter Cindy and her two children came to Missouri with David where they resided until September 1973. Cindy opined that Lynn, not David, was the bastard's father.

Courts may not pretend ignorance of things known to all quidnuncs and the public generally. Consequently, we judicially note that the *ordinary* period of gestation is ten lunar months or 280 days. However, we also must recognize that such a period is subject to many exceptions and variations. *JD v. MD,* 453 S.W.2d 661, 662 (Mo.App. 1970); 31A C.J.S. Evidence § 79, p. 88. By calculating reversely from the birth date of the child (March 28, 1974), and *assuming that the ordinary period of gestation occurred,* we find that conception took place on or about June 22, 1973. Under David's timetable, supra, which evidenced copulation on "a regular basis" commencing with the first weekend in June 1973, conception could very well have occurred about June 22, 1973, or at the inception of an ordinary period of gestation. On the other hand, if it be assumed that the child was conceived near the first sexual encounter testified to by Cindy, i. e. around July 17, 1973, conception would have occurred about 257 days prior to birth. But albeit conception did not take place when the couple first copulated according to Cindy's timetable, a period as brief as 229 days has been held to be not so extraordinarily divergent from the ordinary period of gestation as to permit courts to declare it a medical impossibility. *F——— v. F———,* 333 S.W.2d 320, 327[11] (Mo.App.1960). See also, *Silke v. Silke,* 325 Mass. 487, 91 N.E.2d 200, 203 (1950); *Spears v. Veasley,* 239 Iowa 1185, 34 N.W.2d 185, 186 (1948). Or, put differently, Cindy's in-sistence that regular intercourse with David did not commence until mid-July 1973, did not per se absolutely exclude the possibility of David as the father of the child.

But irrespective of the conflicting timetables, the trial judge heard other testimony from which he could have concluded that David was the child's natural father. David, his mother and Elizabeth (the mutual friend of the parties) testified that Cindy on many occasions had acknowledged David as the father. Dorothy (David's mother) said that Cindy, after the baby was born, sent her pictures of the child and, via letters and telephone conversations, referred to her as "grandmother." In what might be termed a left-handed disputing of these asseverations, Cindy testified that "I never told [them] that [David] was or that he wasn't [the father], I just let them believe what they wanted to believe. I never said yes and I never said no." There were exhibits attesting that Cindy accepted money from David for support of the child, and, while Cindy claimed she listed Thomas (her husband) as the child's father on the Nebraska birth certificate, she admitted naming David as the child's father after returning to Missouri and making application for financial assistance from the Division of Family Services.

The trial court, having actually seen and heard the witnesses, had an opportunity superior to ours to observe their demeanor and behavior and to evaluate, weigh and assess their testimony. Furthermore the trial judge, as the trier of the facts, had leave to disbelieve the testimony of any witness or believe part of a witness' testimony and reject the rest. *Long v. Lincoln,* 528 S.W.2d 512, 513 (Mo.App.1975). "We review this case upon both the law and evidence giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(c) [V.A.M. R.]. This has been construed to mean that the decree of the trial court 'will be sustained . . . unless it is against the weight of the evidence, unless it erroneous-

ly declares the law, or unless it erroneously applies the law.' *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo.banc 1976)." *B. W. v. F. E. W.,* 562 S.W.2d 137, 138 (Mo.App.1978). After a careful conning of the record, more than our abbreviated recitations may suggest, we conclude that in finding David to be the natural father of the child, the trial court's decision was not against the weight of the evidence. Neither did it erroneously declare or apply the law. Moreover, as her "points relied on" and the "argument" portion of her brief suggest, Cindy's proclaimed promiscuities did not unerringly serve to prove that David did not father the child.

■ Cindy's second point relied on claims the trial court erred in sustaining the objection to a question propounded to David which inquired if his wife, Madeline, had *once been married to her daughter's ex-husband.* No offer of proof was made to show what the answer would have been had it been allowed. In the absence of such an offer the complaint is not for consideration on appeal. *Moore v. Parks,* 458 S.W.2d 344, 348[6] (Mo.1970); *Thayer v. Sommer,* 356 S.W.2d 72, 80[11] (Mo.1962).

Cindy's final point relied on complains of the trial court's award of major custody of the child to David. As to this phase of the litigation it should be noted that the court ruled that it "specifically retains jurisdiction herein as to any further proceedings affecting the custody and welfare of [the child] for that purpose but for no other purpose, and the Custody Order entered herein is deemed interlocutory." The court's award of principal custody to David was specifically "subject to rights of visitation by [Cindy] on reasonable occasions."

We deem it uncompassionate of the child's present and future welfare and feelings to record for the prating of across-the-fence twaddlers the exact details of all proffered testimony regarding the fitness vel non of David or Cindy to have principal custody. In addition to the testimony of the parties and their witnesses, the trial court had for consideration home study investigation reports of David and Cindy prepared by the Missouri Division of Family Services and its counterpart in the State of Nebraska. The parties have stipulated that these reports "may be filed with the appellate court for its consideration."

Of course, the chief concern of all courts in determining custody should be the best interest and welfare of the child. *In Interest of B. B.,* 537 S.W.2d 682, 684[1] (Mo.App. 1976). In our review of such cases, we acknowledge the grave burden and responsibility ladened upon the trial judge. We recognize that his personal hearing and observation of the witnesses gives him an opportunity to assess their character and weigh their testimony in excess of what can be gleaned from a reading of the printed transcript. *H____ B____ v. R____ B____,* 449 S.W.2d 890, 891 (Mo.App. 1970).

■ From what has been written heretofore makes it apparent that the trial court was presented with facts which made a decision concerning principal custody most difficult. There was testimony, corroborated to an extent by Cindy, which portrayed her at times as a woman of dubious virtue and which suggested the child in litigation may not have been the only bastard she had borne. On the other hand, David could not be likened unto a saint and Madeline's marital history was not apt to spawn an even-money-bet on the permanency of her latest venture into matrimony with David. In fine, it appears the trial judge was faced with the problem of deciding which of the parents presented the lesser of two not-so-desirable situations and then placed major custody in that parent for the time being. The trial court after pondering the evidence and the home study reports, obviously concluded that giving major custody to David, though not a perfect solution, was a placement of the child in an environment which was presently better economically and otherwise than could now be offered by Cindy.

The judgment is affirmed.

All concur.