Robert Joe COBB et al.,
Plaintiffs-Respondents,

v.

STATE SECURITY INSURANCE COMPANY, Defendant-Appellant.

No. 60626.

Supreme Court of Missouri,
En Banc.

Feb. 13, 1979.

---

Joe Cobb and (3) the child is a member of the insured's "household". We adopt portions of the opinion of the Court of Appeals, McMillian, J., without quotation marks.

## II.

This case involves the story of a young child who was hit by an uninsured motorist and her parents both formerly divorced and who admittedly were never married to each other.

Although it is extremely difficult logically and chronologically to follow the evidence relating to the various divorces, places of residence of the parties, the places of employment, the number of children born in and out of wedlock, as well as other facets of this intriguing case, the jury could reasonably find the following.

Robert Joe Cobb, the acknowledged biological father of Rhonda Lynn House was married to one Ellen Burgess on March 16, 1960. The marriage lasted a very short time—"Not even two weeks." On July 2, 1960, he married Wilda Inez Hunter also known as Chris. That marriage, too, ended in divorce in January, 1963.

In July, 1963, Robert met Norma Jean House who had been married to a Mr. Williams. Norma had five children as a result of her marriage to Mr. Williams one of whom was Donna, a witness in this proceeding. When she met Robert, she was divorced from Mr. Williams. Norma also had a child, born in January, 1964, by a man to whom she was not married and who was neither Robert nor her husband. She was pregnant when she met Robert.

When she met Robert in July, 1963, Norma was living on Gravois in the City of St. Louis and Robert was living with his mother Eugenia [Euceba?] Prather, on Victor Avenue. Robert and Norma were introduced by Norma's sister, Ruth Karn. Sometime later, perhaps in 1966, Robert moved to 2307 South Thirteenth Street, where after a series of residential moves, Norma also moved to Thirteenth Street and was a neighbor of Robert's. Her apartment was next to his. By that time, Robert and

Edward K. Fehlig, Ziercher, Hocker, Tzinberg, Human & Michenfelder, Clayton, for defendant-appellant.

Warren W. Davis, Davis & Davis, Clayton, for plaintiffs-respondents.

JOSEPH J. SIMEONE, Special Judge.

## I.

Plaintiffs-respondents, Robert Joe Cobb and Norma Jean House, as parents of an illegitimate child, Rhonda Lynn House, obtained a judgment in the sum of $7,500.00 against defendant-appellant, State Security Insurance Company in the Circuit Court of the City of St. Louis for the wrongful death of Rhonda Lynn under the uninsured motorist clause of an insurance contract. The insurance company appealed to the St. Louis District and the judgment was affirmed. We granted the Insurance Company's application to transfer and now decide the case as an original appeal. Art. V, § 10, Rule 83.03.

For reasons hereinafter stated we affirm the judgment and hold under the circumstances here (1) the father and mother of an illegitimate child, may maintain an action under the insurance contract for the wrongful death of their child, (2) that the child is a "relative" of the named insured, Robert

Norma were spending a great deal of time together and were having sexual relations. Robert "stayed there quite often in her house . . . [and] 'overnight' ". While Robert maintained a residence, although not a mailing address on Thirteenth Street, Norma moved to Louisiana and Winnebago. When Norma lived there, Robert stayed "five and six times a week." Over the years of this relationship four children were born to Robert and Norma—a pair of twins born in 1966, Rhonda born in 1969, and Robert born in June 1971. It was while Norma lived on Louisiana and Winnebago that Rhonda was conceived. Robert still resided at 2307 South Thirteenth Street. Rhonda was born in a hospital on June 29, 1969. In the interim between the birth of Rhonda and October, 1970, Norma moved to 3936 Russell. During this time, Robert spent a "lot of nights" with Norma, while still retaining his "house" on Thirteenth Street. He had most of his clothes at "home" but had several outfits at Norma's.

In June, 1970, Robert remarried Wilda Inez (Chris) Hunter [1], and bought a home in the 3600 block of Oregon. They lived together for about three months until approximately September, with their son of the previous marriage.

Then in about October, 1970, Robert went to live with Norma on Russell Avenue "permanently". After Robert moved from Oregon to Russell, he testified that he did not keep "any other place [he] might call a residence." From October, 1970, except for about three or four weeks prior to April, 1972, when Robert went to Patricia Thornberg's (his younger sister), at 311 Eichelberger, he lived with Norma and was still living with her at another address at the time of trial held in March, 1976.

In April, 1972, Robert obtained a "Family Combination Automobile Policy" effective April 27, 1972 to April 27, 1973. At the time of taking out the policy, Robert gave as a mailing address 7618 Tennessee and as a residential address 311 Eichelberger—apparently the address of his sister, Patricia.

Under Part IV of the policy—"Family Protection Coverage", the insurance company agreed:

"To pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured automobile because of bodily injury . . . including death resulting therefrom . . sustained by the insured caused. by accident and arising out of ownership, . . or use of such uninsured automobile, . . . .."

Under the "Definitions" in Part IV, "insured" means:

"(a) the named insured and any relative; . . . ." and "Relative" is defined in Part I to mean:

"a relative of the named insured who is a resident of the same household."

The policy was in force on January 6, 1973. On that fateful day, Rhonda Lynn who was now three and one-half years old was hit by an automobile driven by one Virgil Earls, the uninsured motorist between 39th Street and Lawrence in St. Louis.[2] An eyewitness, Jack Regh, saw the accident. He saw the vehicle strike the child. Earls was traveling about twenty-five miles per hour; he did not slow down, or sound any warning or swerve. Mr. Regh flagged Earls down. Robert Joe Cobb came out of "his house and put a blanket" over the child. An ambulance was called and Robert went with the child in the ambulance. Mr. Regh saw Robert "maybe several times . . . .."

Rhonda was taken to the hospital and died on January 18, 1973.

Within a few days, January 25, 1973, the appellant insurance company received a no-

---

1. Norma testified that the marriage "did bother me. It bothers me still yet." But "It didn't change my feelings toward him."

2. A sworn statement of Virgil Earls was introduced in evidence. The statement indicated

that he was involved in an automobile collision with Rhonda Lynn House on January 6, 1973, and on that date he did not carry liability insurance.

tice from a firm of attorneys concerning Rhonda's death. An investigation was made by representatives of the company and some letters were written concerning the investigation. One letter dated March 13, 1973, indicated that ". . . I believe we have to prove, even though Robert Cobb admits to being the father of the deceased, he was married to Chris at that time, and contributed to her support, which should not be too difficult . . .. At the moment things do not look too good . . .."

On April 9, 1974, a petition was filed by Robert Joe Cobb and Norma House for damages against the defendant. An amended petition was later filed in two counts. Count I sought damages from Virgil Earls and Count II sought damages against State Security Insurance Company for $10,000. Because Virgil Earls was never served, he was dismissed from the cause. Trial commenced in March, 1976.

At trial the following additional facts were adduced.

From and after October, 1970, Robert lived with Norma Jean. Several witnesses testified at trial relating to their living together on Russell, and several witnesses testified as to Robert's acknowledgement that Rhonda Lynn was his child. Norma's sister testified that prior to Rhonda's birth when Robert and Norma were living together Robert acknowledged several times that he was the father of the child; that Robert visited Norma and the child in the hospital, and that he was living with Norma when Rhonda was brought home from the hospital. Witnesses indicated that Rhonda referred to Robert as "Daddy", and that he played with the children, disciplined Rhonda, etc. When Rhonda was hit by the automobile, the witness, Mr. Regh stated that Robert came out of the Russell house and put a blanket over the child and went to the hospital. Some days before the accident Regh saw Robert on the porch on Russell.

Joseph Eveland, a long time friend of Robert, testified that prior to Rhonda's birth Robert acknowledged that he was her father. He was present "many times" at the Russell house where Norma, Robert and Rhonda lived.

Robert's mother, Mrs. Prather, stated that Robert acknowledged to her that he was the father of Rhonda, "many times" prior to birth. She was present when Robert "[gave] directions" to Rhonda, that Rhonda called Robert "Daddy".

Norma's daughter, Donna, by her former husband testified that she knew Robert since she was eight years old when Robert "started going" with Norma. She recalled that Robert went to the hospital at Rhonda's birth, that he lived on Russell, that after he left Chris, Donna helped him move to Russell in 1970; she also stated that Robert acknowledged the paternity of Rhonda, before and after Rhonda's birth. According to Donna, Robert played with Rhonda, gave her "love and affection" and "discipline[d]" her.

In their testimony, Robert and Norma corroborated many of the above facts. In open court he acknowledged that he was the father of Rhonda Lynn, he testified he "supported" her, and "contributed" all he could, gave love and affection to her, and that Rhonda called him "Daddy". After he moved to Russell he had no other "residence". He acknowledged that his name did not appear on Rhonda's birth or death certificates but indicated, as to the birth certificate that the hospital would not permit it. While the funeral bill had been paid (by whom is unknown), the hospital bill at the time of trial had not. As to the hospital bill in the amount of $4,683.45, Robert received the bill and the hospital requested payment from him.

Norma also acknowledged that Robert was the father of Rhonda, as well as the three other children. She admitted living with him and after he came back in October, 1970, except for a few months, he had no other residence. Robert visited her in the hospital and while Robert lived with her, Robert helped in raising the child, displayed love and affection, disciplined the child and helped pay Rhonda's bills. Nor-

ma[3] testified that the child was an active child, "help[ed] around the house" and helped pick up after the "new baby" and "[gave] him his bottle". The child was healthy and attended nursery school. Over the years the services the child would have performed would increase. She and Robert shared the expenses of Rhonda, and she received financial support from Robert. She acknowledged, however, that Rhonda's birth was paid for by Medicaid and not Robert, and that she had been receiving welfare for a long time. She denied seeing any other men but Robert "and I don't care to even see any."

At the close of the evidence, appellant insurance company moved for a directed verdict which was overruled. Instructions were given, including Instruction 3, plaintiff's verdict director and 6, plaintiff's damage instruction.

The cause was argued and submitted to the jury and the jury returned a verdict in the sum of $7,500.00. Judgment was entered on the verdict.

### III.

On appeal, the insurance company contends that (1) the trial court erred in denying its motion for directed verdict because (a) the father, Robert, has no rights as a parent under the policy or under the wrongful death act, and no right to the services of the child, Rhonda and (b) he has not proved any actual or pecuniary loss, (2) the court erred in denying its motion for directed verdict on the mother's claim for damages because she was not an insured under the policy and erred (a) in admitting evidence of damages claimed by her, and (b) in giving Instructions 3 and 6, authorizing the jury to find in favor of both the father, Robert and the mother, Norma, and (3) the court erred in denying its motion to reduce judgment because there was no substantial evidence of any "loss of services" and the judgment, therefore, should have been limited to the actual expenses of the hospital and funeral bills which were less than the verdict.

Additionally, in its brief filed in this court, appellant contends that Rhonda was not a "relative" of the named insured, Robert, because Robert is the father of an illegitimate child and also because Rhonda was not a resident of the same "household", as those terms are used in the policy.

### IV.

This is an action on the insurance contract. The wrongful death action is relevant as to whether there is a right of action under the contract.

On this appeal several issues must be resolved: (1) is the biological father of an illegitimate child, as an insured under an uninsured motorist clause legally entitled to recover[4] damages for an action of wrongful death of his child; (2) does the mother[5] of an illegitimate child although not an insured under the contract of insurance, have a right with the father to maintain an action under the uninsured motorist clause for the wrongful death of the child as a legal representative; (3) under the facts of this case is the child Rhonda an insured and a "relative" of the insured Robert Joe Cobb within the meaning of the policy and; (4) is the child, Rhonda, under this record, a member of the insured's, Robert Joe Cobb,

---

**3.** Appellant's counsel contended that Norma was not the real party in interest to recover any damages since she was not an *insured* under the policy. The court indicated that suit was brought by the father and mother as "legal representatives".

**4.** "Legally entitled to recover" means and denotes fault on the part of the uninsured motorist. The phrase involves causal negligence on the part of the uninsured motorist and the absence of contributory negligence when submitted and the resulting damage to the insured.

*Reese v. Preferred Risk Mutual Insurance Company,* 457 S.W.2d 205, 208 (Mo.App.1970).

**5.** Appellant contends that both Robert and Norma must possess both rights of being an insured and being able to maintain a wrongful death action. We do not agree. It is sufficient if Robert is an insured and Norma has a right to recover as a legal representative of Rhonda. The wrongful death action is relevant only as to whether the father has a right to recover under the contract.

"household"? Collateral issues that also need resolution are: (1) whether the court erred in giving instructions 3 and 6 authorizing the jury to find in favor of both the father, Robert and mother, Norma, and (2) whether the court erred in failing to reduce the judgment because there was no substantial evidence of any "loss of services".

## V.

██ Since this is an action under an uninsured motorist clause of the insurance policy, the action may be brought directly against the company—an unsatisfied judgment against the uninsured motorist, Virgil Earls, is not a condition precedent to recovery from the insurer. *Hill v. Seaboard Fire & Marine Insurance Co.,* 374 S.W.2d 606, 611 (Mo.App.1963). The fact that Virgil Earls was dismissed from the action did not jeopardize the cause of action against the insurance company. *Reese v. Preferred Risk Mutual Insurance Company,* 457 S.W.2d 205, 208 (Mo.App.1970). The action is one of contract. *Crenshaw v. Great Central Ins. Co.,* 527 S.W.2d 1, 4 (Mo.App.1975). In order to prevail on this contract action the plaintiffs must establish that at the time this litigation was commenced they were legally entitled to recover damages from the uninsured motorist. In other words, as an essential element of the cause of action in contract it must be demonstrated that the plaintiffs have a right to recover for the wrongful death of their daughter. *Crenshaw,* 527 S.W.2d at 4. Merely establishing "fault" on the part of the uninsured motorist is not sufficient. *Hunt v. State Farm Mut. Auto. Ins. Co.,* 560 S.W.2d 280, 282 (Mo.App.1978).

The initial question then becomes whether the named insured, Robert Cobb, has a right to recover for the wrongful death of Rhonda.

The whole complex question of the rights of illegitimate children and the rights and duties of parents of children born out of wedlock has had a long and evolving history. It has not as yet been completed. The law relating to such rights and responsibilities have developed slowly and by degrees.

██ The common law was harsh, simple and inflexible. An illegitimate child was "nullius filius" or "filius populi". 1 Bl. Comm. 458–459 (Lewis's ed.); 2 Kent Comm. 212 (14th ed.). The child was the child of no one.

The next stage of the development of the law mainly in the last century emphasized the rights and duties between mother and child. The rigors of the common law were ameliorated by statutes and decisions. It was established that the mother is the natural guardian of such child, § 475.025 [6], RSMo 1969, and that the child and mother had reciprocal rights of inheritance. See § 474.060, RSMo 1969. These statutes gave illegitimate children inheritable blood so far as the mother was concerned. See *Baker v. Stucker,* 213 Mo.App. 245, 248 S.W. 1003, 1005 (1923). *Cf. Banks v. Galbraith,* 149 Mo. 529, 51 S.W. 105, 106 (1899).

As early as 1894 in this state, this court held in *Marshall v. Wabash R. Co.,* 120 Mo. 275, 25 S.W. 179 (1894) that the mother of an illegitimate child could maintain an action for the wrongful death of her illegitimate child.

At this stage of development, the biological father had no responsibilities and was not accorded any particular rights. In *State v. White,* 363 Mo. 83, 248 S.W.2d 841, 843 (1952) this court, for example, held that, under a statute then in force, the father could not be held criminally responsible for the support of his child, absent legal custody. The duty of support fell upon the mother because of her right to custody.[7]

---

6. "In all cases . . . the father and mother, with equal powers, rights and duties, while living, and in case of the death of either parent the survivor, or when there is no lawful father, then the mother, if living, is the natural guardian of their children, and has the custody and care of their persons and education." Section 475.025, RSMo 1969. See historical note § 457.020, 26A V.A.M.S., Appendix.

7. Section 559.353, was adopted in 1965 after the *White* decision which now imposes the duty of support upon the father of an illegitimate child.

The third stage of development in this whole complex question emphasized the rights of an illegitimate child. This development has occurred only in recent years. The rights of the child are based on the premise that there are no illegitimate children, there are only illegitimate parents. The modern philosophy relating to the rights of such children are based on the premise that:

> "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. . . . Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent. . . ." *Weber v. Aetna Casualty & Surety Company*, 406 U.S. 164, 92 S.Ct. 1400, 1406–1407, 31 L.Ed.2d 768 (1972).

In recent years the Supreme Court of the United States and this Court have recognized the rights of a child born out of wedlock. In *Levy v. Louisiana*[8], 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) it was held that such a child may not be discriminated against and may recover damages for the wrongful death of the mother. In *Glona v. American Guarantee & Liability Ins. Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) it was held that the mother may recover for the wrongful death of her illegitimate child. In *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), an Illinois law which permitted illegitimate children to inherit only from their mother and not the father was struck down as violative of equal protection. *Weber, supra*, granted to illegitimates the right to recover workmen's compensation benefits for the death of their natural father.[9] And in *Gomez v. Perez*, 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), the Supreme Court held that illegitimate children were entitled to support enforceable in a civil proceeding.[10]

In this state the rights of an illegitimate child have been recognized as against the father. In *R____ v. R____*, 431 S.W.2d 152 (Mo.1968), relying on *Levy* and *Glona* it was held that under our statutes the father of an illegitimate is criminally responsible for the support of the child and that the state is prohibited from discriminating between legitimate and illegitimate children. "The principles applied by the United States Supreme Court would render invalid state action which produces discrimination between legitimate and illegitimate children insofar as the right of the child to compel support by his father is concerned. . . ." *R____ v. R____*, 431 S.W.2d at 154. See also *Wessels v. Gipfel*, 522 S.W.2d 653 (Mo.App. 1975).

Hence in recent years the rights of children born out of wedlock have been recognized in many contexts.[11]

---

**8.** In *Levy*, the Court assumed that the mother treated the children as a parent would treat a child, that she worked and supported the children. The court held that illegitimate children are not "nonpersons". 88 S.Ct. at 1511—"Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. These children, though illegitimate, were dependent on her; she cared for them and nurtured them; . . . ."

**9.** At the time of the father's death the father resided and maintained a household with a woman to whom he was not married.

**10.** "We therefore hold that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother. . . ." *Gomez v. Perez*, 93 S.Ct. at 875.

**11.** In recent years the illegitimate child is also entitled to maintain an action for the wrongful death of the father. *Armijo v. Wesselius*, 73 Wash.2d 716, 440 P.2d 471, 473 (banc 1968); *Weaks v. Mounter*, 88 Nev. 118, 493 P.2d 1307, 1310 (1972); *In re Estate of Perez*, 69 Misc.2d 538, 330 N.Y.S.2d 881, 887 (1972); *Schmoll v. Creecy*, 54 N.J. 194, 254 A.2d 525, 529, 38 A.L.R.3d 605 (1969); *Carroll v. Sneed*, 211 Va. 640, 179 S.E.2d 620, 622 (1971). See also annot. 38 A.L.R.3d at 613 (1971).

Although the courts have increasingly recognized the rights of illegitimate children, and the rights and responsibilities of the mother, the rights of the biological father have not been fully articulated.[12] This is no doubt due to many problems of proof as well as society's attitudes. This fourth stage of development is just beginning to be recognized and articulated.

*Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) is perhaps the seminal case dealing with certain rights of the biological father. In *Stanley*, the Supreme Court held that the State of Illinois was barred from taking custody from an unwed father who had lived with the mother intermittently for 18 years without affording due process to the father.

*Stanley* was distinguished in *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). There the high court held that the natural father's rights under due process were not violated with respect to vetoing an adoption where the father had not exercised actual or legal custody, never shouldered any significant responsibility for the child and the father had not over a long period of time petitioned for legitimation.

Several courts have now recognized certain rights of the biological father. Courts have held that such a father have equal rights of custody[13] and such fathers have been awarded custody of such children. *Vanderlaan v. Vanderlaan*, 9 Ill.App.3d 260, 292 N.E.2d 145 (1972); *E v. T*, 124 N.J.Super. 535, 308 A.2d 41 (1973); *Sparks v. Phelps*, 22 Or.App. 570, 540 P.2d 397 (1975); *David v. Cindy*, 565 S.W.2d 803 (Mo.App. 1978).[14]

In several recent decisions dealing with the rights of the biological father to recover for the wrongful death of a child it has been held that the father may maintain such action. In *Holden v. Alexander*, 39 A.D.2d 476, 336 N.Y.S.2d 649 (1972), the New York court in a case of first impression, held that the natural father who took the child into his home was to be treated as a distributee under the wrongful death act.

"To hold otherwise would seem not only to create a windfall for tortfeasors who happen to be fortunate enough to have committed their tortious acts against illegitimates . . ., but also to render a gross injustice to this particular plaintiff, who would have suffered a wrong without being provided any remedy." *Holden*, 336 N.Y.S.2d at 655.[15]

In *Wilcox v. Jones*, 346 So.2d 1037 (Fla. App.1977), the Florida appellate court held that "To recognize the right of the natural mother of an illegitimate child to maintain a wrongful death action but in the same breath to refuse to recognize the corresponding right of the natural father, would violate the equal protection clauses of the state and federal constitutions." *Wilcox*, 346 So.2d at 1038. The court relied on *Glona* and *Trimble*.

■ In this fourth stage of development and under these recent decisions, recognizing certain rights of the biological father we are compelled to conclude that when the biological father has openly acknowledged the child as his own, has exercised custody and has shouldered responsibility with respect to supervision, support, protection and care of the child, the biological father has a right to maintain a wrongful death action

---

12. See Schwartz, Rights of a Father with Regard to His Illegitimate Child, 36 Ohio State L.J. 1 (1975).

13. See Schwartz, *supra*, 36 Ohio St.L.J. at 8.

14. Such fathers have also been given rights of visitation. See 10 Am.Jur.2d, Bastards, § 62 at p. 78 (1978 Supp.).

15. See Note on İHolden: Note, 22 Buff.L.Rev. 1111 (1973). See *Eckel v. Hassan*, 61 A.D.2d 13, 401 N.Y.S.2d 820 (1978). See also, *Moore*

*v. Thunderbird, Inc.*, 331 So.2d 555 (La.App. 1976)—biological father entitled to maintain action for death. Relying on *Glona*, the court held that to apply a different rule to the father would deprive him of equality of rights. The issues of support and contact with the child are properly concerned with proof of paternity and the amount of damages to which a biological father may be entitled, and not to the basic right of the father to recover as a matter of law. *Moore*, 331 So.2d at 558.

for the death of his illegitimate child. *Cf. Quilloin v. Walcott*, 98 S.Ct. at 555.[16]

Our Wrongful Death Act, § 537.080(2), RSMo1969 provides that if the deceased is a minor and unmarried, the action is to be brought by the "father and mother, natural or adoptive, who may join in the suit . . . ." The statute does not distinguish between unmarried legitimate or illegitimate children. "The statute makes no reference to the marital status as between the parents." *Higgins v. Gosney*, 435 S.W.2d 653, 657 (Mo.1969).

Under our wrongful death act and under the modern judicial decisions, we conclude therefore that the father, Robert Joe Cobb, had rights as a parent of Rhonda to commence and maintain an action for wrongful death under the policy. Here, Robert acknowledged Rhonda as his child before and after birth; he lived with Norma and the children at the Russell address over a period of years; he openly acknowledged Rhonda as his child to Norma and to others; Norma recognized Robert as the father; Robert gave support, love and affection to the child and disciplined the child. In these circumstances we cannot say that Robert, and the mother, Norma,[17] are to be deprived of a right of action for wrongful death.

We reject therefore the appellant's first point that Robert had no rights as a parent.

## VI.

Appellant next contends that since Norma was not an insured under the policy, the trial court erred in refusing to sustain its motion for directed verdict.

It is true that the right to recover under an uninsured motorist clause is on the contract and not in tort. It is also true

that § 379.203(1), RSMo1975 provides that no automobile liability insurance shall be issued unless coverage is provided "for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of . . . death . . . ." Appellant contends that Norma was not an insured under the policy and hence is not entitled to recover. Since she cannot be a relative and since she is not an insured it is contended she has no rights under the policy. But this contention is inapposite to the issue whether under the policy of insurance, the insured or "his legal representative shall be legally entitled to recover" damages for the death of Rhonda—an insured under the policy. The question is not whether Norma is an insured under the policy, but whether she is a legal representative of an insured under the definition of the policy. Norma need not be an insured under the policy, if Rhonda is within the definition of an insured.

In *Sterns v. M.F.A. Mutual Insurance Company*, 401 S.W.2d 510, 517 (Mo.App. 1966) the term "legal representative" was discussed. In a scholarly opinion by Cross, J., after reviewing the purposes of uninsured motorist coverage, the court stated:

"It is our view that this coverage was intended to provide indemnity for damages resulting from an insured's wrongful death caused by an uninsured motorist, payable to whatever person or persons may be entitled to bring an action under provisions of V.A.M.S., § 537.080, whether spouse, child or children, parent or parents, or administrator or executor. . . ."

"We uphold that purpose [of uninsured motorist coverage] by declaring that the term 'legal representative' used in the

16. Under the facts of this case we need not decide whether every biological father, after hurdling the problems of proof, is entitled to commence a wrongful death action absent the above elements. We need not go as far as *Moore v. Thunderbird, Inc., supra*—that support and contact with the child are concerned with the amount of damages, not the right to recover.

17. Claim for wrongful death is vested in both parents and creates an indivisible right. *State ex rel. Slibowski v. Kimberlin*, 504 S.W.2d 237, 239 (Mo.App.1973); *Higgins v. Gosney*, 435 S.W.2d at 657.

policy, as it applies to a person or persons claiming damages for a wrongful death, includes *all persons* who may have the right to bring an action under V.A.M.S., Sec. 537.080, and that its meaning is not restricted to an administrator or executor. It is our specific ruling here that under . . . the legal effect of Coverage E, the plaintiff parents shall be considered as the 'legal representative' of the deceased unmarried child. . . ." *Sterns*, 401 S.W.2d at 517 and 519. (Emphasis added).

■ It is clear that Norma, as the mother of Rhonda, has a claim for wrongful death under *Marshall* and *Glona, supra*, and hence is a "legal representative" within the terms of the uninsured motorist coverage under the authority of *Sterns*. Norma is a person who has a right of action under the wrongful death act and hence is included within the term "legal representative" to recover damages under Part IV of the policy for the death of Rhonda.

### VII.

The right of the mother to recover damages, hinges, of course, on the question of whether Rhonda is an "insured" within the meaning of Part IV of the policy. Under the definition of insured, insured means the named insured, Robert, and any "relative". "Relative" is defined as a "relative of the named insured who is a resident of the same household". The appellant relies on several decisions[18] to show that Rhonda is not a relative.

■ In uninsured motorist coverage, the meaning of relatives residing in the household is not absolute and inflexible. Generally, courts favor an interpretation to provide insurance coverage. See Widiss, A Guide to Uninsured Motorist Coverage, § 2.6, pp. 25–26 and 1978 Supp. at 6.

This is a case involving "uninsured motorist coverage" and not a case of a different hue. The term "relative" has been defined as "A kinsman; a person connected with another by blood or affinity." Black's Law Dictionary at 1453 (Revised 4th ed., 1968); See *Insurance Co. of No. America v. Stevens*, 425 F.2d 704 (5th Cir. 1978) (nephew is a "relative").[19] In an uninsured motorist case, a stepdaughter was held to be a relative "within the generally accepted meaning of the word." *Box v. Doe*, 221 So.2d 666, 669 (La.App.1969).

■ Surely, the child here, Rhonda Lynn, is a "relative" within the meaning of that term in the policy. She is a person connected with Robert by blood. Notwithstanding the fact that an illegitimate child may not be a "relative" in other contexts as in the decisions relied upon by the appellant, we believe that so far as uninsured motorist coverage is concerned an illegitimate child is a "relative", i. e., a person connected with another by blood of the insured, Robert Joe Cobb.[20]

### VIII.

■ We also hold that the illegitimate child of the named insured, Robert Joe

---

18. *Lavigne v. Ligue Des Patriotes*, 178 Mass. 25, 59 N.E. 674 (1901); *Succession of Wesley*, 224 La. 182, 69 So.2d 8 (1953); *State Farm Mutual Automobile Ins. Co. v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965); *Aetna Life Insurance Co. v. McMillan*, 171 F.Supp. 111 (N.D. Ohio 1958); *Cooper v. Melvin*, 223 Ga. 239, 154 S.E.2d 373 (1967); *Butcher v. Pollard*, 32 Ohio App.2d 1, 288 N.E.2d 204, 62 A.L.R.3d 1316 (1972); *Haley v. Metropolitan Life Insurance Company*, 434 S.W.2d 7 (Mo.App.1968).

19. In *Haley v. Metropolitan Life Insurance Company, supra*, the court of appeals held that an illegitimate child is a "child" within the meaning of the Federal Employees Group Life Insurance Act.

20. The decisions relied upon by appellant are either decisions rendered before the more recent cases expanding the rights of illegitimate children or parents, or are not controlling in this context. For example, *Lavigne* held that an illegitimate child is not a member of a beneficiary association since the father had no duty to support; *Aetna Life Ins. Co. v. McMillan, supra* —illegitimate child not covered by group life policy.

The modern trend and the majority of decisions hold that even for insurance purposes the word child of the insured is broad enough to encompass all offspring whether legitimate or not. See Annot., 62 A.L.R.3d 1329, 1332 (1975).

Cobb, under the unique facts here, was a member of the insured's (Robert's) "household" within the meaning of the uninsured motorist coverage.

Most decisions interpreting "household" deal with an exclusionary clause to safeguard the insurer against collusion and the natural partiality of an insured to members of the insured's household or family circle. *Giokaris v. Kincaid*, 331 S.W.2d 633, 640 (Mo.1960).

In *Mission Insurance Company v. Ward*, 487 S.W.2d 449, 451 (Mo. banc 1972) "household" is defined as "those who dwell under the same roof and compose a family." "Family is defined as 'the body of persons who live in one house and under one head including parents, children, servants, and lodgers . . . .'" *Mission Insurance Company*, 487 S.W.2d at 451.

"Household" is a chameleon like word. The definition depends on the facts of each case.[21] It is difficult to deduce any general principles. One theory examines the length of time the parties intended to remain in the home and whether the arrangement is permanent or temporary. *Mission Insurance Company*, 487 S.W.2d at 451; *Giokaris*, 331 S.W.2d at 641. The other theory focuses on the functional character of the arrangement or whether the parties function as a family unit under one management. See *Automobile Club Inter-Insurance Exch. v. Tonkins*, 509 S.W.2d 802, 805 (Mo.App. 1974); *State Farm Mutual Automobile Ins. Co. v. McBride*, 489 S.W.2d 229, 233 (Mo. App.1972).

Although for different purposes the meaning of the word may differ, "household" is a word to describe a close relationship, varying in detail, where people live together as a family in a closely-knit group, usually because of a close relationship by blood, marriage or adoption and who deal with each other informally and not at arms length. *National Farmers Union Property & Cas. Co. v. Maca*, 26 Wis.2d 339, 132 N.W.2d 517, 521 (1965); Note, 26 Drake L.Rev., *supra*, at 830.

While the relationship here was not a lawful union, there was substantial evidence that Robert lived, on a permanent basis with Norma and the children, Rhonda called him "Daddy", the parties lived together as a single unit and were functioning as a family for several years. Robert acknowledged the child as his, he supported her to his ability, he gave her love and affection. In such circumstances, we hold that for the purposes of uninsured motorist coverage, Rhonda Lynn was, under the unique facts of this case, a member of the household of the insured.

### IX.

Appellant contends that damages as to actual and pecuniary loss were not proved, that the court erred in admitting evidence of damages claimed by the mother, in giving Instructions 3 and 6 and in denying its motion to reduce judgment to reflect actual loss. We find these points to be without merit.

The recognized principle relating to damages for the wrongful death of a minor child is the value of the child's services during minority[22] and other expenses incurred by reason of wrongful death. *Collins v. Stroh*, 426 S.W.2d 681, 686 (Mo.App. 1968); *Hildreth v. Key*, 341 S.W.2d 601, 613–614 (Mo.App.1960); *Brewer v. Rowe*, 363 Mo. 592, 252 S.W.2d 372, 376 (banc 1952).[23]

The measure of damages and the amount of the verdict in an action for

---

21. See Note, Defining "Relative", "Member of the Household", etc., 26 Drake L.Rev. 824, 829 (1977).

22. Under our recent decision of *Mitchell v. Buchheit*, 559 S.W.2d 528 (Mo. banc 1977) it is held that parents are entitled to establish reasonable probability of pecuniary benefits beyond the age of minority.

23. The majority rule is that the court may admit evidence concerning the parents' income and financial condition where such evidence has a reasonable tendency to show the extent of their pecuniary loss. *Hildreth*, 341 S.W.2d at 614.

wrongful death of a minor inherently involves some element of speculation and intangibles. *Brewer*, 252 S.W.2d at 377; *Collins*, 426 S.W.2d at 689. An award is not based on direct, positive evidence but upon probabilities which the jury must reasonably find. The jury has an extraordinarily wide discretion in determining the amount of recovery in such wrongful death cases. *Aubuchon v. LaPlant*, 435 S.W.2d 648, 650 (Mo.1968). The probabilities depend upon the child's age, condition, health, mentality, personality and the parent's ages and circumstances. In cases of this kind the award of damages can rest only on considerations of the most general character and much must be left to the common sense of the jury. *Collins*, 426 S.W.2d at 689.

 The evidence here showed that Rhonda was a healthy, active, normal child. She helped around the house, Robert helped support the child, and Norma received financial assistance from Robert. Over the years the services of the child would have increased. There was substantial evidence relating to Rhonda's condition, health, mentality, future development and services performed. In this posture we cannot say that damages were not proved or that Robert did not prove pecuniary loss or that the court erred in admitting evidence of damages claimed by the mother. Compare the evidence in *Brewer v. Rowe, supra.*

Appellant complains that Instructions 3 and 6 are erroneous because Norma Jean was not an insured under the policy and that Robert is the only party with any contractual rights. But since we have held that Norma Jean is a "legal representative" under the policy she had a right to sue and recover thereon.

The court did not err in giving Instructions 3 and 6.

We rule these contentions against appellant.

## X.

 Finally, appellant contends that the court erred in not granting its motion to reduce the amount of the judgment from $7,500.00 to the damages actually proved, hospital and funeral expenses—$5,033.45.

In view of the previous discussion, we cannot say that the award of approximately $2,500.00 in the case of this child was an excessive award of damages for the wrongful death of the child and that the trial court abused its discretion. This contention is without merit.

Having disposed of the points and contentions raised by the appellant, the judgment of the trial court is affirmed.

The judgment is affirmed.

MORGAN, C. J., and DONNELLY, J., concur.

BARDGETT and SEILER, JJ., concur in part and dissent in part in separate opinions filed.

FINCH, Senior Judge, dissents in separate dissenting opinion filed.

RENDLEN, J., dissents and concurs in separate dissenting opinion of FINCH, Senior Judge.

WELLIVER, J., not participating because not a member of the Court when cause was submitted.

BARDGETT, Judge, concurring in part and dissenting in part.

I respectfully dissent. The reason this case was transferred after opinion in the Missouri Court of Appeals, St. Louis district, was to review the question of whether the putative father has a cause of action for the wrongful death of his illegitimate child. The principal opinion recognizes this to be the core issue in the case and, after citing a number of cases, states that we are compelled to conclude that when a biological father openly acknowledges paternity, exercises custody and responsibility with respect to supervision, support, protection and care for the child,[1] he has a *right* to maintain a wrongful death action for the death of his

---

1. These issues were not submitted to the jury and there has been no finding by either the trial judge or the jury that the putative father satisfied these criteria.

illegitimate child. I cannot determine if this conclusion is reached through a reinterpretation of the Missouri wrongful death statutes or because of a belief that constitutional equal protection requires it or both. In any event, I do not believe the court is *compelled* to the conclusion reached by the principal opinion under statutory interpretation or constitutional equal protection or both.

If our Wrongful Death Act, sec. 537.080, RSMo 1969, grants the putative father the right to sue for the death of his illegitimate child, then the issue is resolved in favor of plaintiff Robert Cobb. In my opinion, sec. 537.080 does not give the putative father the right to sue. Sec. 537.080(2) provides in part, ". . . then by the father or mother, natural or adoptive, . . . ." The principal opinion notes that this statute makes no distinction between unmarried legitimate or illegitimate children, and quoting from *Higgins v. Gosney,* 435 S.W.2d 653, 657 (Mo.1969), says, "The statute makes no reference to the marital status as between the parents."

But this case does not involve the *rights of children,* legitimate or illegitimate, but purely whether the *putative father* has a right of action, nor does *Higgins v. Gosney, supra,* decide any issues with reference to legitimate or illegitimate children, nor with reference to putative fathers. The principal opinion seems to infer that the legislature intended to make no distinction between legal fathers and putative fathers reference wrongful death actions for the death of their children.

The language of our wrongful death statutes has not changed very much over the years. In *Marshall v. Wabash R. Co.,* 120 Mo. 275, 25 S.W. 179 (1894), the court had to decide whether the mother of a deceased child was required to join the putative father as a party to a wrongful death action for the death of their child. Sec. 4425, RSMo 1855 (chapter 51, sec. 2), provided in part, ". . . or, third, if such deceased be a minor and unmarried, then by the father and mother, who may join in such suit, and each shall have an equal interest in the judgment, or if either of them be dead, then by the survivor." This statute was amended in 1885 under the title, "An act to amend sections . . . , extending the rights of adoptive children and their parents by adoption," so as to describe the persons who may sue, and provided in part, ". . . or third, if such deceased be a minor and unmarried, whether such deceased be a natural born or adopted child, . . . then by the father or mother who may join in the suit, and each shall have an equal interest in the judgment, or if either of them be dead, then by the survivor."

The court construed the words "*natural born* child" in the 1885 amendment to mean the same as the word "child" meant in the 1855 statute and stated that the amendment was intended to extend the rights of adoptive children and their adoptive parents. It was not for the purpose of vesting illegitimate children or a putative father with rights they did not have under the former law. The court reviewed the status of illegitimate children under the common law and earlier cases and then held as follows, 25 S.W. at 181:

"The harsh rules of the common law have been modified by express statute in this state, so that the mother is declared the natural guardian of her illegitimate child. Section 5279, Rev.St. 1889. And section 4473 declares: 'Bastards shall be capable of inheriting and transmitting inheritance on the part of the mother, and such mother may inherit from her bastard child or children in like manner as if they had been lawfully begotten of her.' This section does not, it is true, legitimate a bastard, but it concedes to him inheritable blood on the mother's side. Instead of being the son of nobody, as at common law, he has a mother who is recognized as such by our laws. The duty of supporting him rests upon her, and she is entitled to his services during minority. As the chief and principal incapacity of a bastard has been removed, so far as he and his mother are concerned, there seems to be no good reason why a statute which speaks of parents and children should not

apply to a mother and her illegitimate child, unless there is something in the statute, or the subject about which it treats, to show that it was not intended to apply to persons standing in that relation. To say the mother of an illegitimate child cannot maintain a suit under the second section of the damage act is to say she cannot maintain one under the third and fourth sections, which do not fix the damages at a stated amount, but allow compensatory damages, not exceeding $5,000; and it is to say an illegitimate child cannot recover, under either section, for the loss of its mother. We cannot believe the legislature ever intended such results. As the mother of an illegitimate child is, by our law, deemed and treated a mother, we think she is within the meaning of the damage act, and that the father of such child is not. This is but giving effect to what we understand to be the legislative policy of this state. It follows that the plaintiff can maintain this suit, and that the reputed father need not, and ought not to, be made a party. All concur."

Section 475.025, RSMo 1969, provides that when there is no lawful father, "then the mother, if living, is the natural guardian of their children, and has the custody and care of their persons and education."

The interpretation *Marshall* places on our wrongful death statute regarding a putative father's right to sue for the death of his illegitimate child has been recognized as the currently prevailing interpretation of the present wrongful death act by several law committees of the Missouri Bar which reviewed wrongful death acts and wrote a proposed act for Missouri. See "Wrongful Death", Washington University Law Quarterly 1973, pp. 327–378. The committee proposed, *inter alia*, to *abolish illegitimacy* "as a bar to recovery by a child for a parent's death and vice versa". *Id.* 368. The committee proposed extensive amendments to the Missouri wrongful death act which were introduced as H.B. 1466 in the 76th General Assembly but the bill did not go beyond the first or second reading stage. I do not cite the introduction of H.B. 1466 and its failure of passage as any indication of current legislative intent, for it is obvious that many bills fail of passage for reasons that have nothing to do with the merits of the proposal. Sometimes bills are not passed simply because time runs out. I cite the Washington Law Quarterly article and H.B. 1466 as support for the proposition that the current thought as to the meaning of the Missouri wrongful death act regarding a putative father's right to sue among lawyers and law professors is the same as expressed by this court in *Marshall,* and the principal opinion does not expressly modify or overrule *Marshall.*

I will not undertake a detailed re-analysis of the cases cited in the principal opinion with respect to what the opinion describes as the first three stages of the development of rights of illegitimates and putative fathers. Suffice it to note that those cases deal primarily and almost exclusively with the *rights of the illegitimate child,* not the putative father. That is understandable because it was the child, not his putative father, who, under the common law suffered because of the single status of his parents. The putative father had no rights with respect to the child, but what was of more importance to most of them was that they had no obligations to either the child or the mother. Today, although support can be ordered by a court of a putative father, the fact is that the mother still, in almost every instance, bears the actual responsibility for the support and care of the child. The facts of this case show a man who, while married to another woman and with children by her, abandons his legal family and resides sporadically with Norma Jean and sires her children but leaves when he pleases. He has not entered into any legal relationship which involves reciprocal legal duties, as in the case of marriage, which, in turn, provides the basic recognizable unit, the family, which is considered to be in our society the best and acceptable environment for the rearing of children. I have found no legal authority to the effect that a putative father is entitled to the services and earnings of his illegitimate

child. Indeed, our laws designate the mother to be the natural guardian of such child. This is not by law a *shared* guardianship—it is by law the mother's and not the father's.

Our wrongful death law is essentially a compensatory rather than a punitive act.

With respect to the constitutional issue, it should be stated at the outset that no decision of the United States Supreme Court requires a state to afford the right to sue for the "wrongful death" of a child to a putative father just because it affords that right to the mother. The most recent case dealing with rights of illegitimate children vis a vis their putative father is *Lalli v. Lalli*, —— U.S. ——, 99 S.Ct. 518, 58 L.Ed.2d 503 [1978]. The court there held the equal protection clause of the U. S. Constitution, Amendment 14, does not require that legitimate and illegitimate children be afforded equal rights as to inheriting from their fathers. The New York statute considered in *Lalli* required that an illegitimate child could inherit from his father only, ". . . if a court of competent jurisdiction has, during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child." The court proceeded on the basis that the appellant-claimant, Robert M. Lalli was the son of the deceased Mario Lalli. There had been no order of filiation obtained as required by the statute and Robert Lalli contended the equal protection clause of Amendment 14 rendered the statute, supra, unconstitutional. The Supreme Court held that the statutory requirement of a filiation order served an important state interest, to wit, a "just and orderly disposition of property at death", [at ——, 99 S.Ct. at 523], and therefore did not violate the equal protection clause.

In my opinion, there are important state interests which a state legislature is entitled to recognize and serve by granting the right to sue for the wrongful death of an illegitimate child to the mother and not to the father. It is important that someone be legally responsible for the care of children born out of wedlock from birth onward. Our statute, sec. 475.025, places this responsibility with the mother and vests her with the rights of guardianship of the child. This is for the child's welfare and is a matter in which the state obviously has an interest. It is important that authority over the child not be divided between two persons who have no legal relationship to one another (the unmarried mother and putative father) and who, therefore, owe each other no legal duties.

Just as the state's interest in the just and orderly disposition of property at death was recognized in *Lalli,* so, too, should the state's interest of wrongful death actions be recognized. This also is a pecuniary item as the only purpose in filing the suit is to obtain money damages. The state has, in my opinion, a substantial interest in providing that the one who has the legal obligation to care for the illegitimate child and who is entitled to the child's services be the one who is to be compensated for the loss. That is what, in effect, our wrongful death statute provides and, as such, I believe that it does not violate the state or federal constitutions in failing to allow the putative father to sue. See *Hughes v. Parham,* 241 Ga. 198, 243 S.E.2d 867 (1978)[2] where a statute similar to ours was upheld as against similar contentions.

Once again it should be noted that the issue here cannot be resolved on the basis of the "best interests of the child." The child is dead. In *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), cited in the principal opinion, the putative father's rights with respect to vetoing the adoption of his illegitimate child were adjudicated on the basis of the "best interest of the child" standard. Denying the putative father's rights equal to a legal father's did not offend constitutional due process or equal protection in *Quilloin.*

---

**2.** This case is pending on appeal to the U. S. Supreme Court [—— U.S. ——, 99 S.Ct. 75, 58 L.Ed.2d 106, 1978].

*Quilloin* is inapposite to the instant case as, in my opinion, is *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), because in both of those cases there was a living child or children whose interests played a significant role in the case as it was the *future* care of those children that was involved. Here nothing in the future can serve the interest of the child because the child is dead. Therefore, the "best interest of the child" criterion cannot be applied. Additionally, the principal opinion leaves the basic question of whether or not a particular putative father has the *right to sue* for the wrongful death of the child without utilizable guidelines or method of decision. It cannot be assumed that the natural mother will always welcome the putative father's intrusion into the case. Obviously his presence in the case will cause a reduction in the mother's share of the proceeds, as sec. 537.080(2) specifies that when the action is for the death of an unmarried minor by the father and mother then "each shall have an equal interest in the judgment." How will a mother suing for the death of her illegitimate child determine whether the putative father has a right to sue? What lawyer could advise his defendant client to settle a case where the deceased is an illegitimate child with any confidence that the settlement will end the claim?

In my opinion, our wrongful death statute does not grant the right to sue to a putative father and that statute is not unconstitutional as depriving a putative father of equal protection.

I would hold that plaintiff Robert Joe Cobb does not have a cause of action for the wrongful death of Rhonda House. This would require the judgment in favor of Robert Joe Cobb to be reversed and the cause remanded for a new trial and permit the new trial to be on damages only with the sole party plaintiff being Norma Jean House *if* Norma Jean House is entitled to maintain this type of action as against State Security Insurance Company under the uninsured motorist coverage of the policy.

I agree with the holding of the principal opinion that the deceased child was a relative of the named insured and "a member of the same household" as the named insured. Under the definition in the policy, Rhonda was an "insured". Norma Jean was her mother and natural guardian and had the right, as her mother, to sue for the child's wrongful death. *Sterns v. M.F.A. Mutual Ins. Co.,* 401 S.W.2d 510, 517 (Mo. App.1977), cited in the principal opinion, holds that the term "legal representative", as used in uninsured motorist policy provisions, means any person who is entitled to sue for the death of another under sec. 537.080. Norma Jean has the right to sue as the mother of the deceased child and therefore is entitled to the benefits of an "insured" under the uninsured motorists coverage of the policy.

I would reverse the judgment in favor of Robert Joe Cobb outright and reverse the judgment in favor of Norma Jean House and remand the case for retrial as to damages only with the sole plaintiff being Norma Jean House.

SEILER, Judge, concurring in part and dissenting in part.

I concur in that portion of the opinion of Simeone, J., which holds that plaintiff Robert Cobb has the right as a parent of the child Rhonda to maintain an action for her wrongful death under the policy.

I concur in the dissenting opinion of Finch, Sr., J., that Norma Jean House, the mother of the child, is not entitled to recover from defendant insurance company on the policy it issued to Robert Cobb.

FINCH, Senior Judge, dissenting.

I respectfully dissent from the principal opinion. I would reverse.

I agree with and concur in that portion of the dissenting opinion of Bardgett, J., which takes the position that Robert Joe Cobb, the biological father of Rhonda, is not entitled to recover for her wrongful death.

I also dissent from the holding that Norma Jean House, the mother of Rhonda, is entitled to recover from defendant insurance company on the policy it issued to Robert Joe Cobb.

The right of Norma Jean House to recover for the wrongful death of her daughter is conferred on her in her capacity as parent of a dependent minor child. This is the right created by the wrongful death statute. That act does not provide a right of action in the mother for her own benefit as legal representative of the deceased daughter. That being true, the policy issued by defendant to Robert Joe Cobb does not cover Norma's claim for the wrongful death of her daughter. The policy only promises to pay sums which an insured or his legal representative is entitled to recover. This means, where the claim is for wrongful death, those sums which such persons are entitled to recover under the wrongful death act. Since Norma is not a relative of Robert Joe Cobb and is not an insured under the policy definitions and since she is not entitled under the wrongful death act to recover in the capacity of legal representative of Rhonda, I would hold that Norma cannot recover on the policy sued upon and would reverse the judgment as to her. Insofar as *Sterns v. M.F.A. Mutual Insurance Company,* 401 S.W.2d 510 (Mo.App. 1966) is inconsistent with the views herein expressed, I would hold that it should not be followed.